**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 21, 2026

**BY ECF**
The Honorable Jennifer L. Rochon
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re: *United States v. Keith Taylor*, S2 24 Cr. 524 (JLR)**

Dear Judge Rochon:

The Government respectfully submits this letter in advance of the sentencing of defendant Keith Taylor, who is scheduled to be sentenced on October 28, 2026, following his conviction for one count of wire fraud, for defrauding Modest Needs Foundation ("Modest Needs"), a non-profit organization, in violation of 18 U.S.C. § 1343, and eight counts of tax evasion, in violation of 26 U.S.C. § 7201, for the calendar years 2017 through 2024. For the reasons explained below, the applicable Guidelines Range for the defendant is 151 to 188 months' incarceration, and a below-Guidelines, but substantial, sentence of incarceration of 108 months is sufficient and no greater than necessary to advance the ends of sentencing.

Taylor ran a charity meant to help people living paycheck-to-paycheck with unexpected expenses they could not pay. He stole donations intended to support that charity, and spent the money on himself—living an extravagant lifestyle dining at the fanciest restaurants in Manhattan while residing in a luxury high-rise apartment overlooking Lincoln Center with money meant for the working poor—and lied about the money he was taking and the governance of the charity. Taylor engaged in this conduct without any apparent regard to his obligations to the charity, its donors, or the people he used along the way.

Taylor's embezzlement and lies did not stop when he was charged with this crime. In violation of the terms of his pretrial release, he continued stealing money donated for charitable purposes, and spending it on himself, despite purporting to have handed over control of the charity's bank accounts to a third person. He has failed to accept responsibility for his crimes. After pleading guilty, Taylor tried to withdraw his guilty plea, and submitted an affidavit in support of that motion which directly contradicted his sworn allocution at the time of his plea. These considerations are related, aggravating, and set Taylor apart from other defendants who accept responsibility for the wrongfulness of their conduct, giving the Court confidence about the risk of recidivism.

## I. Background

### A. Taylor's Criminal Conduct

#### 1. Modest Needs and Taylor's Pre-Charge Embezzlement

In 2002, Taylor, who held a Ph.D. and was then a junior professor at Middle Tennessee State University, founded Modest Needs Foundation ("Modest Needs"), a charity designed to connect donors with low-income workers facing unexpected expenses.[1] Presentence Investigation Report dated December 19, 2025 ("PSR"), ¶¶ 103, 104. Donors were drawn to the charity's purpose: "to help families in distress;" "to help people who were facing emergencies they couldn't handle alone;" "to keep the working poor from falling over the poverty line;" "to find veterans and families who just need a bit of help for a short time to see them through;" and to "help provide individuals with a way to avoid homelessness, medical debt, or keeping the lights on." *See* Victim Impact Statements, attached as Exhibit A to this submission. Many donors were prior recipients of grants from Modest Needs; many more regularly donated small amounts they could barely spare. *Id.*

But from early on, Taylor used donations to the charity to finance his luxury lifestyle. At least as early as 2009, Taylor used Modest Needs's funds for meals at fine-dining restaurants and other personal expenses. Presentence Investigation Report dated December 19, 2025 ("PSR"), ¶¶ 11, 16; *see also* Victim Impact Statements from certain Modest Needs Former Employees, attached as Exhibit B. As Modest Needs grew, so did the defendant's embezzlement. *See* PSR ¶¶ 28-33.

Taylor structured Modest Needs to permit and conceal his theft. He alone controlled the charity's finances and accounts. PSR ¶ 23. When someone previously challenged his financial decisions or accounting, he fired them. PSR ¶¶ 16; 20. For example, in 2009, Modest Needs hired a Chief Financial Officer ("CFO") and an independent external auditor. PSR ¶ 16. The CFO observed in 2009 that Taylor was spending Modest Needs funds at Per Se, one of the most expensive restaurants in New York City, and on other personal expenses. To cover his tracks, Taylor altered Modest Needs's accounting practices to facilitate his surreptitious embezzlement. PSR ¶ 16. And when the CFO confronted Taylor about his spending in early 2010, Taylor fired her. *Id.* Taylor's greed was consequential: it redirected money that was supposed to help the most needy to fund a life of luxury.

Taylor similarly disregarded efforts by an outside auditor to rein in his misconduct. The outside auditor at various times identified that Taylor was using the charity's corporate credit card

[1] The defendant represented to the Probation Department, PSR ¶ 99, and twice in his submission that he received his doctorate from the University of Tennessee, Knoxville with honors *summa cum laude*. Taylor Sentencing Letter, Dkt. 116 ("Taylor Ltr.") 1, 4. However, the Government confirmed with a representative of the University's graduate school that doctorates are not awarded with Latin honors, and the transcript information the Probation Department received from the University did not include any honors associated with Taylor's doctorate, doctoral coursework, or dissertation.

for his personal expenses, PSR ¶ 17; advised Taylor it was illegal for him to borrow money from the charity he oversaw, *id.*; flagged that Taylor engaged in self-dealing by awarding his web development company a million-dollar contract, *id.* ¶ 19; and pointed out that the entity lacked adequate controls by allowing Taylor to review his own accounting decisions and his use of a corporate credit card, *id.* ¶ 23.

After the outside auditor directed Taylor to disclose in the charity's 2011 IRS Form 990 a related party transaction (in connection with Taylor paying his shell company for web development services) and that he owed money to repay personal expenses the charity paid for him, as with the CFO, Taylor simply stopped using the outside auditor rather than use Modest Needs's funds for their intended charitable purpose. PSR ¶ 20.

Taylor went to great lengths to ensure that Modest Needs maintained a good rating on Charity Navigator, a charity assessment organization, which relied on Form 990 filings. PSR ¶ 21; 42. Taylor sued Charity Navigator to remove a "Donor Advisory" warning it put on the Modest Needs page as a result of the 2011 Form 990. PSR ¶ 21. Taylor was right to worry; numerous donors to Modest Needs relied on Charity Navigator to vet Modest Needs before donating. PSR ¶ 41; *see also* Ex. A.

Additionally, Taylor's use of Modest Needs's funds to pay for his personal expenses was flagged by the IRS in a civil audit, which resulted in a civil settlement with Taylor incurring a large tax assessment for multiple years that remains unpaid as of this date.[2]

2. Taylor's Charged Embezzlement and Fraud from 2015 through the Plea

Taylor further consolidated his authority over Modest Needs's funds in 2015, when he prompted the entity's small board of directors to resign *en masse* after Taylor filed the charity's Form 990 with the IRS without it first being reviewed by the board, even though the form represented that the board had reviewed and approved it. PSR ¶ 34. Although the board's general oversight of Modest Needs was marginal and generally ineffective, its mere existence was a moderating force on Taylor. With the board having resigned, however, Taylor's control over Modest Needs was completely unrestrained, and his personal spending of funds donated to Modest Needs grew significantly and went entirely unchecked.

Taylor's spending and lifestyle after 2015 was anything but modest. He was a regular at the finest and most expensive restaurants in New York City, where he was known as a high spender. PSR ¶ 31. At times, Taylor used his personal financial accounts and reimbursed himself with Modest Needs funds; other times, he brazenly used a Modest Needs corporate credit card to purchase indulgent luxuries for himself. As just one example, in December 2021, Taylor used Modest Needs's credit cards to pay for a $10,000 dinner for two at Per Se, buying a wine pairing and a $5,500 bottle of 2014 Domaine de la Romanée-Conti. PSR ¶ 31(b). Taylor used a Modest Needs corporate credit card to spend over $68,000 of Modest Needs's money at Per Se between

[2] Taylor also filed a civil lawsuit against the IRS agents involved in the civil lawsuit, which was promptly dismissed. *See Modest Needs Foundation and Taylor v. Bianco*, 16 Cv. 3144 (HBP), 2017 WL 3130416 (S.D.N.Y. July 21, 2017), *aff'd* No. 17-2605 (2d Cir. Aug. 21, 2017).

2017 and 2022. This does not include the money he spent at Per Se from his personal accounts, which he funded through transfers from Modest Needs.

Per Se was not the only high-end restaurant where Taylor used Modest Needs corporate credit cards to pay for dinners and drinks that included champagne and caviar. PSR ¶ 31. As another example, Taylor used Modest Needs credit cards to pay for numerous multi-thousand-dollar meals at Jean-Georges, which Taylor referred to as "my standby." GX 2047.[3] He used Modest Needs credit cards to pay for numerous multi-thousand-dollar meals at Le Bernadin, including a $10,000 meal for two in June 2021 which included imperial caviar, a $2,900 bottle of 2004 Krug Clos du Mesnil champagne, and a $3,800 bottle of 2017 Domaine des Comtes Lafon Montrachet. PSR ¶ 31(e). Setting aside the Modest Needs funds that Taylor used for self-reimbursement, and focusing only on the times that Taylor used the Modest Needs corporate credit cards at these restaurants, Taylor used the Modest Needs credit cards to run up hundreds of thousands of dollars of expenses for his fine dining. PSR ¶ 31.

Taylor not only used charity credit cards for these meals, but he prided himself on his connections to these restaurants, bragging about who he knew and where he ate to others, including people he messaged online. PSR ¶ 31(b)(ii). He flaunted his fine dining to demonstrate that, as he put it, "money isn't an issue for me." GX 2036. For example, he bragged about how a famous chef once printed out a card for him, pictured below, calling him the "King of Per Se:"




As Taylor explained, in September 2023 text: "I was proclaimed King of Per Se for being one of their longest-standing customers. And on that particular day, I went by myself …. They gave me the royal treatment, [the owner] came out and we had a chat, and I said, 'you know,

[3] GX 2047 and GX 2036, cited below, are exhibits the Government anticipated offering at trial in this matter. Prior to the defendant's guilty plea in August 2025, the Government produced its anticipated trial exhibits to the defense, including GX 2047 and GX 2036.

tonight you've made me feel like the king of Per Se.' He said, 'Well, in a way, you are the king of [P]er [S]e.'"

Taylor's extravagance with Modest Needs money, donated to help those in urgent need of financial assistance, went beyond fine dining. Since at least 2017, Modest Needs paid hundreds of thousands of dollars for Taylor's rental of an apartment at a luxury high rise in midtown Manhattan. PSR ¶ 30. Taylor bragged about his apartment's view of Lincoln Center. As another example of Taylor's extravagant expenses paid for by Modest Needs, in July 2021, Taylor paid $14,500 of Modest Needs's money for sapphire and diamond jewelry for a woman for Christmas. PSR ¶ 33.

Taylor not only used Modest Needs's funds for his luxury expenses; he also spent Modest Needs's funds on his everyday expenses. He used more than $180,000 of Modest Needs's money to pay for food and grocery delivery services over the years, with delivery to his apartment. PSR ¶ 32. He used Modest Needs's funds to pay off nearly half a million dollars of credit card debt on his personal credit cards. *Id.* And he used Modest Needs's funds to pay for his medical expenses. *Id.* He withdrew over $200,000 in cash from Modest Needs bank accounts during this period, despite Modest Needs not using cash in its business model. PSR ¶ 28. All the while, during this same period, at times, Modest Needs would be unable to timely make payroll to its employees, who were actually the ones ensuring the charity distributed grants to recipients. PSR ¶ 16; *see also* Ex. B.

After thwarting the board, CFO, and outside auditor from effectively providing oversight of Modest Needs, in or about 2016 Taylor fabricated a sham board of directors to carry on his crimes. Taylor used the names of at least three people in his life—his housekeeper, his ex-girlfriend, and a friend that was a bartender from a high-end restaurant—and claimed they functioned as the board of directors overseeing Modest Needs between approximately 2016 and 2025. PSR ¶ 35. In fact, as he admitted after the investigation began, their directorship was "in name only," and they did not meet or do anything to further the interests of the organization. PSR ¶ 34. They did not participate in board meetings and they did not approve or review Taylor's expenses. PSR ¶¶ 36-28. Nonetheless, Taylor posted the names of these acquaintances on the Modest Needs's website, and used their identities on the charity's IRS Forms 990, claiming they were independent, voting members of a functioning board. The Forms 990 stated that these purported board members met with Modest Needs's external auditors and approved the tax forms before they were filed. PSR ¶ 40(a). The forms also claimed that the purported board members set Taylor's compensation based on analysis of comparative data. PSR ¶ 40(b). Neither was true. These individuals did not know their names were being used in this way—to falsely represent to donors to the charity, and to the IRS, that there was an appropriate governance structure at the charity, when in fact there was none. PSR ¶ 36(d); 37(c); and 38(e). This conduct imposed significant and concrete harm on the individuals whose identity he used. *See* Victim Impact Statement from Taylor's Housekeeper, attached as Exhibit C.

Taylor also lied about his salary on the website and on the Forms 990, understating the amount of money he was taking from the charity by millions of dollars. *See* PSR ¶ 25. Taylor lied about his salary, at least in part, because he knew donors relied on that information in determining whether to make donations. PSR ¶ 21; *see also* Ex. A. He made up numbers to suit his needs. For

example, the Modest Needs Form 990 for 2020, written and filed by Taylor, listed Taylor's salary as $162,819. But when Taylor wanted to upgrade his apartment in June 2020, and move to a larger apartment on a higher floor of his Manhattan high-rise, he submitted a lease application listing his salary as $325,000. Neither salary figure came close to the total amount that Taylor actually took from Modest Needs in 2020: at least approximately $546,474. PSR ¶ 43.

Taylor's lies on the Forms 990 also affirmatively misrepresented his income to the IRS. PSR ¶ 43. Year after year, Taylor told the U.S. Government that he earned less income than he actually he did. By embezzling in the ways he did, by paying his expenses with Modest Needs's money, and avoiding Modest Needs's payroll system, Taylor avoided having any Forms W2 filed with the IRS that would reflect his actual income. He lied to the IRS to avoid paying taxes, and in fact never paid his taxes at all, including the large unpaid tax assessment resulting from the earlier audit of himself and Modest Needs by the IRS. *Id.*

Finally, egregiously, Taylor's embezzlement did not stop after he was charged with these crimes. While on pretrial release, Taylor continued to drain Modest Needs's accounts to pay for his own expenses. PSR ¶¶ 44-46.

3. Taylor's Conduct Harmed Thousands

Taylor's conduct devastated the more-than 15,000 donors to Modest Needs, who thought their money was going to help the needy. Attached as Exhibit A are approximately 200 letters from donors to Modest Needs, expressing how Taylor's crimes have affected them and their faith in charitable giving. The donor-victims describe feeling "profoundly disappoint[ed]," "deeply disturbed," "gutted," "horrified and depressed," and on and on by Taylor's conduct. They reflected that "stealing money meant for those in need is atrocious." They describe Taylor's conduct as reprehensible, abhorrent, unforgiveable, sickening, devastating, distressing, heartbreaking, appalling, upsetting and sad, and disgusting. The hurt that Taylor inflicted on these victims is palpable in their letters: "I don't have words to describe how disappointed I am;" "It pierced my heart and stunned me;" "It has hurt my soul;" "It makes me hot and sick to think about." One wrote simply: "It hurts, my heart."

The fact that Taylor used a charity for his fraud vastly exacerbates the harm the donor-victims reflect in their letters. Worse than just stealing money, "he did it by exploiting people's desire to help others," and "[h]is conduct is a betrayal of the very community he claimed to serve." Another victim wrote, "This was not simply a matter of financial loss. It was a betrayal of values." Another, "my faith in humanity has been shattered." Another, "I cannot begin to describe the betrayal I felt at something so well-intended being used in such a base, frivolous, and disgusting way."

Moreover, victim upon victim reflected that their experience with Taylor's fraud has shaken their trust in other charities, and harmed the public's confidence in charitable giving. One wrote, "[t]his case is about siphoning off people's charitable funds, but indeed something more was taken, chiefly trust." Others wrote similarly: Taylor's fraud "has shaken my faith in charitable organizations;" "[i]t has made me lose faith in people and has changed my donation habits completely;" "Keith Taylor has taken any trust in charitable organizations away from me;" "I will

not be so quick to donate in the future and that feels awful. I hate that Keith Taylor has made me so distrusting and skeptical;" "It's made it more difficult for me to trust in the integrity of other humanitarian charities." "Mr. Taylor's fraud has done widespread damage to the social trust that is crucial to all provision of charitable social services." "This type of theft erodes the decency and integrity of our non-profits and erodes public trust."

And dozens of the victims, despite having had their donations stolen, remained focused on the harm that Taylor's conduct did to those in need—the people who would have benefited from the donations to Modest Needs but for Taylor's embezzlement. One wrote: "Yes, Mr. Taylor misused my donations but it's the untold legit charities and people in need that rely on them who are the real victims because donors like me will be less likely to contribute thanks to trust broken by the likes of Mr. Taylor." Another wrote, "[w]hat Mr. Taylor has done here is funnel potential donations away from deserving recipients—both those to whom Modest Needs was supposed to be providing support and those who might have been helped in the future by similar donations form me and others." Another, "[t]he donors aren't the only victims. The people who sought help through Modest Needs, who bared their souls, who were willing to talk about the financial problems they were in, who were seeking help from their fellow countrymen, their neighbors really, they are the ultimate victims."

In response to the Government's request for information which would support a restitution order, many of the donor victims asked instead that their donations go to the people they were intended to help: "I would prefer that monies proceeding from the case go first to the families who applied for aid—as we had intended when we made the donations." "If there is any way to receive any restitution for my donations that were used for fraudulent purposes, I would be interested in that so I could channel the funds towards the intended purpose of helping people in need." "Any funds I should receive in the future I will dedicate to charity—my original goal in giving to Modest Needs." "I hope any restitution that is generated goes to a truly worthy cause in line with what Modest Needs should have been, and not what Keith Taylor made it."

The letters from the donor-victims reflect the real harm Taylor's actions inflicted: "Mr. Taylor has done innumerable damage to all charities."

### B. Procedural History

On June 4, 2024, Taylor was charged by complaint. Dkt. 1. He was arrested on June 11, 2024, and on September 4, 2024 he was indicted by a grand jury in this District. Dkt. 14.

At his initial appearance, the Honorable Sarah L. Cave, United States Magistrate Judge for the Southern District of New York, set bail, on consent, of a $250,000 personal recognizance bond cosigned by one financially responsible person, with additional conditions including a requirement that Taylor remove himself as a signatory on all Modest Needs financial accounts. Dkt. 4. At the initial pre-trial conference on September 6, 2024, this Court modified the terms of Taylor's release to also prohibit his continued employment at Modest Needs.[4] Dkt. 21, at 12. In discussing the

[4] In its September 5, 2024, letter seeking a modification to the terms of Taylor's pre-trial release, the Government noted that Modest Needs was prohibited from soliciting charitable contributions

terms of Taylor's release at the conference, Taylor, through counsel, represented to the Court that (1) he "was removed from having signature authority over the foundation's bank accounts" and (2) he was "no longer employed and no longer in the operations of Modest Needs Foundation." *Id.* at 11.[5]

In June 2025, after the Government discovered Taylor had continued—even after his arrest—to use donations to Modest Needs to pay for his personal expenses, including his rent for his luxury rental apartment, and sought Taylor's remand for violation of release conditions, the Court further modified Taylor's conditions of release. Dkt. 55. The Court ordered that Taylor provide: "proof to pretrial services that he no longer has access to Modest Needs bank accounts or funds and does not have login credentials for any Modest Needs's accounts"; and bank statements on a monthly basis until the date of the jury trial. The Court emphasized that Taylor "shall have no access to, and shall receive no compensation or money from, Modest Needs's bank accounts or any money that is held by Modest Needs."

On August 18, 2025, Taylor entered a plea of guilty to Counts One and Three through Ten of the second superseding indictment pursuant to a plea agreement. In February 2026, the Court ordered Taylor detained. Dkt. 93.

On July 16, 2026, Taylor moved to withdraw his guilty plea, which motion the Court denied on September 24, 2026 in a 33-page opinion. *See* Dkt. 115.

## II. Discussion

### A. Applicable Law

Following *United States v. Booker,* 543 U.S. 220 (2005) and *United States v. Crosby,* 397 F.3d 103 (2d Cir. 2005), the Guidelines continue to provide a critical touchstone. Indeed, while the Guidelines are no longer mandatory, they remain in place, and district courts must "consult" them and "take them into account" when sentencing. *Booker,* 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid

---

and grants in New York, or engaging in any other charitable fundraising activities in New York, due to its canceled registration with the New York Attorney General's Charities Bureau. Dkt. 16.

[5] Taylor did not provide documentary evidence supporting his representation that he was removed from these accounts as a signatory.

unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). *See Gall,* 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant;
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

**B. Taylor's Appropriately Calculated Guidelines Offense Level is 34**

In July 2025, Taylor and the Government agreed to a stipulated guidelines range in the plea agreement, which reflected enhancements that the aggregate loss amount is more than $3,500,000 but less than $9,500,000, that the offense involved 10 or more victims; the offense involved a misrepresentation that the defendant was acting on behalf of a charity; the defendant abused a position of private trust; and the defendant committed the offense while on pre-trial release. Accordingly, the plea agreement stipulated that Taylor had an offense level of 29 and a criminal history category of I, resulting in a Guidelines range of 87 to 108 months' imprisonment. *See* PSR ¶ 59-76; 109. These calculations align with Probation's calculation of the Guidelines in the PSR, which was prepared before Taylor moved to withdraw his plea.

The plea agreement, however, specifically set forth that:

> Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, see U.S.S.G. § 3E1.1, regardless of any stipulation set forth above, if the defendant fails clearly to demonstrate acceptance of responsibility, to the satisfaction of the Government, through the defendant's allocution and subsequent conduct prior to the imposition of sentence. Similarly, nothing in this Agreement limits the right of the Government to seek an enhancement for obstruction of justice, see U.S.S.G. § 3C1.1, regardless of any stipulation set forth above, should it be determined that the defendant has either (i) engaged in conduct, unknown to the Government at the time of the signing of

> this Agreement, that constitutes obstruction of justice or (ii) committed another crime after signing this Agreement.

Taylor's actions post-plea, specifically his statement to Probation, his motion to withdraw his guilty plea, and his affirmation in support of his motion, have changed the applicable Guidelines range. Based on his post-plea conduct, (i) Taylor should *not* receive three points of acceptance credit pursuant to U.S.S.G. § 3E1.1(a) and (b), and (ii) he should receive two additional points for obstruction of justice pursuant to U.S.S.G. § 3C1.1. Accordingly, the correctly calculated Guidelines range is 151 to 188 months' incarceration.

That said, because the Government is recommending a sentence of imprisonment within the parties' original stipulated guidelines range of 87 to 108 months' imprisonment, it is up to the Court whether it is necessary to resolve any potential Guidelines dispute. *See United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005) ("situations may arise where either of two Guidelines ranges, whether or not adjacent, is applicable, but the sentencing judge, having complied with section 3553(a), makes a decision to impose a non-Guidelines sentence, regardless of which of the two ranges applies"); *see also United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008) (en banc).

1. Taylor Has Not Accepted Responsibility for his Crimes

U.S.S.G. § 3E1.1(a) and (b) provide for a cumulative 3-point reduction in offense level where the defendant has clearly demonstrated acceptance of responsibility for the offense. "Whether or not a defendant has accepted responsibility for a crime is a factual question." *United States v. Razzouk*, 828 F. App'x 773, 779 (2d Cir. 2020) (quoting *United States v. Irabor*, 894 F.2d 554, 557 (2d Cir. 1990)). The sentencing judge's determination on acceptance of responsibility is entitled to "great deference" because she "is in a unique position to evaluate a defendant's acceptance of responsibility." *United States v. Kuman*, 617 F.3d 612, 635 (2d Cir. 2010).

A motion to withdraw a guilty plea "is a well-established ground for denying the acceptance of responsibility adjustment." *United States v. Hirsch*, 239 F.3d 221, 226 (2d Cir. 2001); *United States v. Hill*, No. 22-1536, 2024 WL 831676, at *2 (2d Cir. Feb. 28, 2024), *cert. denied*, 145 S. Ct. 212 (2024) (citing *Hirsch*). While a motion to a withdraw a plea does not "automatically disqualify[] a defendant from seeking an adjustment," in order to seek that adjustment, the Second Circuit has "made clear, however, that the reason for withdrawing the plea must be unrelated to a claim of innocence." *Id.* (citing *United States v. Negron*, 967 F.2d 68, 73 (2d Cir. 1992). Attempting to withdraw a guilty plea "is a valid basis to deny acceptance credit where defendant's reason for withdrawing the plea relates to his claim of innocence." *Hirsch*, 239 F.3d at 226. Minimizing responsibility through a "carefully worded plea allocution" and "falsely den[ying] and frivolously contest[ing]" guilt are "inconsistent with acceptance of responsibility." *Kumar*, 617 F.3d at 636 (citing U.S.S.G. § 3E1.1, cmt. n.1(a)).

Taylor has not accepted responsibility for his crimes, and is not entitled to acceptance credit. He moved to withdraw his plea, based in part on his claimed innocence, and he still contends now that he is innocent, Dkt. 115 at 1; Dkt. 116 at 2, a position incompatible with acceptance of

responsibility. Therefore, Taylor is not entitled to any points for acceptance of responsibility under the Guidelines.

2. <u>The Obstruction of Justice Enhancement Applies</u>

In support of his untimely and frivolous claim of innocence, Taylor also obstructed justice. U.S.S.G. § 3C1.1 provides for a two-point increase in offense level where a defendant "willfully obstruct[s] or impede[s], or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution or sentencing of the instant offense of conviction." The application notes to the provision make clear that the enhancement applies when a defendant "commit[s], suborn[s], or attempt[s] to suborn perjury;" when he "provid[es] materially false information to a judge" and when he "provid[es] materially false information to a probation officer in respect to a presentence or other investigation for the court." U.S.S.G. § 3C1.1, Application Note 4(B), (F), and (H).

In November 2025, Taylor provided Probation with a written statement containing materially false information. Taylor described his embezzlement as overspending, and increasing his personal debt to Modest Needs, and claimed that his "accounting errors" "were the product of exhaustion, inexperience, and fear-not concealment or intent to deceive." PSR ¶ 55. In his sworn affirmation in support of his motion to withdraw his plea, Taylor went further and claimed that he was not guilty, and that he "did not intend to deceive or defraud the organization's donors or anyone else." Dkt. 105 ¶ 3. Taylor also claimed that "[t]o the extent the amounts I received exceeded what was formally documented as my salary, I understood the excess as additional compensation and treated it as a personal debt to the organization that I was repaying." *Id.* As the Court explained in detail in denying Taylor's motion to withdraw his guilty plea, these denials of intent to deceive directly contradict Taylor's sworn allocution and all of the evidence in this case. Because of this obstruction, Taylor's offense level should be increased by two points pursuant to U.S.S.G. § 3C1.1.

**C. A Substantial Term of Imprisonment Is Warranted**

The factors set forth in 18 U.S.C. § 3553(a) strongly weigh in favor of a substantial term of imprisonment.

1. <u>The Seriousness of the Offenses</u>

*First*, the nature and seriousness of the offenses and the need to provide just punishment warrant a significant sentence of imprisonment. *See* 18 U.S.C. § 3553(a)(1), (2)(A). It is difficult to overstate the seriousness of Taylor's offenses, which lasted for more than ten years. Taylor stole millions of dollars from a charity dedicated to helping the neediest and betrayed the trust of thousands of the charity's donors. His actions so severely damaged Modest Needs that the charity is now defunct. Taylor championed his dedication to the charity and its mission in working to grow the organization, and it was precisely this reputation that Taylor relied on as he raided the charity for millions more during the pandemic.

The impact of Taylor's crimes was not merely limited to specific funds stolen from the charity and its members. Numerous donors in their letters to this Court describe the wide-ranging impact of Taylor's conduct. Taylor not only stole money that these donors expected to go to help the neediest, but he also destroyed their confidence in charitable giving. In addition, Taylor misused the identities of those close to him—like his housekeeper, a former girlfriend, and a bartender—who he falsely claimed were directors of the charity and that they had reviewed and approved his salary and expenditures. And he lied about all of this conduct to the Court in attempting to withdraw his plea.

As the Honorable Colleen McMahon, United States District Judge for the Southern District of New York, explained in *United States v. Binday*, No. 12 Cr. 152 (CM), a case that involved an insurance fraud scheme where the defendant was sentenced to 144 months' imprisonment, "[o]nly if white collar crime is punished commensurate with the damage it inflicts on society will citizens actually believe that the law metes out equal right to the poor and to the rich, which words are the cornerstone of the judicial oath." ECF No. 349, Sent'g Tr., at 46; *see also id.* at 45 ("There are crimes for which a critically important component of sentencing should be to send a message to the community, for the industry that this kind of behavior is intolerable, and to send a message to the community and to the industry that this sort of behavior is every bit as reprehensible as the types of crimes for which I and others like me routinely send poor, disadvantaged persons to prison for dozens of years."); *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) ("While no defendant should be made a martyr to public passion, meaningful punishment is still necessary to reaffirm society's deep-seated need to see justice triumphant.").

Moreover, that Taylor continued the commission of the offenses while on federal bail is a serious aggravating factor. Taylor's willingness to violate the conditions of his federal pretrial release renders it difficult to have real confidence that he will not reoffend, or that he will obey conditions of supervision upon release from custody. Even beyond that, Taylor's willingness to take advantage of the release he was granted under the Bail Reform Act in order to continue to commit his offenses has a corrosive effect on the trust that is a crucial component of any system of pretrial release. The system simply does not function when defendants mislead the Court, like Taylor did, in order to continue paying for his luxury lifestyle with Modest Needs's funds while on pretrial release.

In addition, Taylor did not file income tax returns and evaded paying taxes on all of the money received (legitimate and illegitimate alike) from the charity. Tax offenses, like Taylor's, are serious, costly, and damaging to our nation's system of taxation. *See United States v. Ture*, 450 F.3d 352, 357 (8th Cir. 2006) ("The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system."). The Supreme Court has long recognized that "[t]he United States has relied for the collection of its income tax largely upon the taxpayer's own disclosures rather than upon a system of withholding the tax from him by those from whom income may be received." *Spies v. United States*, 317 U.S. 492, 495 (1943). The orderly operation of government and our society relies on its citizens and residents to report timely, completely, and honestly all taxes they owe, which is why Congress has made it a criminal offense to file false returns or evade income taxes. Indeed, as the Second Circuit has recognized, "tax crimes represent an especially damaging category of criminal offenses," which "strike at the foundation of functioning government." *United States v. Zukerman*, 897 F.3d 423, 427 (2d Cir. 2018) (cleaned

up). *See generally Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) ("[t]axes are what we pay for a civilized society. . . .") (Holmes, J., dissenting).

The tax offenses at issue in this case have cost the United States Treasury and the nation's honest taxpayers, not only the taxes that should have been paid on Taylor's off-the-books income (like extravagant dinners at the finest restaurants in the city or the rent for his luxury apartment), but the time value of the money—that is, the interest on the unpaid taxes. The offense conduct also resulted in significant losses to the New York State taxing authorities. There were no mitigating circumstances related to Taylor's deliberate and repeated tax evasion. On the contrary, they came after years of Taylor filing false Forms 990, an IRS audit, and a large unpaid tax assessment. Taylor was experienced with the IRS at the time he committed these crimes. Taylor's misconduct was not aberrant or prompted by a brief lapse in judgment, but was informed, and sustained over nearly a decade.

2. The History and Characteristics of the Defendant Warrant a Substantial Sentence

*Second*, the history and characteristics of the defendant, the nature and the circumstances of the offenses, and the need for the sentence imposed to promote respect for the law warrant a substantial sentence. *See* 18 U.S.C. §§ 3553(a)(1), (2)(A). Taylor did not engage in fraud and embezzlement hesitantly, fleetingly, or on a small scale. He did so for approximately ten years, in multiple ways, and without any apparent hesitation. Taylor then hid all of the money he was stealing by misrepresenting his salary on Modest Needs's IRS Form 990s, which misled donors and charitable giving advisors that relied on this information, such as Charity Navigator. And while Modest Needs helped real people under his leadership, by the time the fraud became its most egregious (during the pandemic), employees reported observing Taylor generally focus his time on activities benefiting himself (like fine dining), not on activities directed towards the charity's mission. In short, Taylor had plenty of chances to stop committing criminal conduct—but he chose to continue, notwithstanding that he was a highly-educated professional. Taylor continued to engage in this conduct even though auditors had expressly instructed him that he could not use the charity to pay for personal expenses, that he needed to repay prior personal expenses that the charity had paid for him, and that he needed to disclose all such transactions fairly and accurately in the charity's tax filings. And he continued engaging in fraud even post-arrest, controlling Modest Needs's bank accounts when he was prohibited from doing so and directing those funds to pay for his personal expenses, including his luxury apartment. The Court's sentence should reflect this fact. In addition, the Court's sentence should reflect that Taylor abused his position with the charity, destroyed the charity he had created, undermined faith in charities, and was motivated by greed and a desire for prestige.

More painfully, Taylor has not shown any genuine remorse for what he did or shown concern for the charities' donors, the individuals whose identities he used to list as purported board members, the harm he caused, or even acknowledged that his actions and his choices are what led to his prosecution. On the contrary, Taylor's concerns appear solely focused on his own loss of standing and positions, and related consequences. *See* Taylor Ltr. 8-9.

The Government acknowledges that Taylor's background includes mitigating factors, including his age and health, and has taken them into account when crafting its sentencing recommendation. The Court may and should take those factors into consideration, and they justify the substantial downward variance the Government is recommending from the correct Guidelines range of 151 to 188 months' imprisonment. But they deserve no more weight than that. The Court should still impose a significant sentence of incarceration, reflective of the harm these crimes have caused and the defendant's abject refusal to take responsibility for his actions.

3. The Need for General Deterrence is Strong in This Case

*Finally*, the need for general deterrence strongly weighs in favor of a significant sentence for Taylor. *See* 18 U.S.C. § 3553(a)(2)(B). As described above, Taylor made it difficult to detect his long-running fraud or uncover its full scope. When such a scheme is successfully prosecuted, a substantial sentence is warranted to deter others who might otherwise be tempted to engage in similar conduct. *See, e.g.*, *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

Taylor's suggestion that he need not be sentenced to a significant prison term to achieve robust deterrence, Taylor Ltr. 9, flies in the face of case law, logic, and human experience. And, as the Court is aware, the need for deterrence for tax crimes, like the conduct engaged in by Taylor, is also particularly acute. To the extent that Taylor's suggestion is grounded in Taylor's representation that he has "lost his life's work, his profession, his reputation, and his financial future," it should be rejected out of hand. Taylor Ltr. 2, 9. Indeed, the approach for which Taylor advocates would lead to the perverse result that sentences in those cases in which a defendant is particularly successful and has been used to a life of luxury would be the *lowest*, because only such a defendant has a reputation and material goods to lose, *id.*

To leniently sentence Taylor, who has failed to accept responsibility entirely and who engaged in a long-term fraud that harmed so many, would result in an unwarranted disparity and would fail to promote respect for the law. Nothing in Taylor's submission warrants a substantial variance from the applicable Guidelines here.

**D. Taylor's Arguments Are Unpersuasive**

In his sentencing submission, Taylor requests an unspecified "sentence substantially below" the stipulated Guidelines range in the plea agreement, Taylor Ltr. 1, 9, which would amount to a drastic variance from the applicable Guidelines range. In support of his request, Taylor presses multiple arguments, many of which are addressed above. None warrants the substantial variance he seeks.

Taylor asserts the need to "avoid unwarranted disparities" among defendants with similar records who have been found guilty of similar conduct, warrants a below Guidelines sentence in this case, referring to the Sentencing Commission's Judiciary Sentencing Information (JSIN) data. Taylor Ltr. 3-4 (citing 18 U.S.C. § 3553(a)(6)). However, the mere reference to the median and mean sentences for the offense level in the PSR is of little use in fashioning a sentence here. Not only does the offense level in the PSR (on which the JSIN data is based) not take into account Taylor's post-plea conduct—both filing his motion to withdraw the plea and his perjurious affidavit in support—but data such as this does not take into account the unusual set of aggravating factors present here, which also includes the destruction of a charity, harm to thousands of donors, and the misuse of multiple individuals' identities.

Taylor describes certain physical and psychological conditions from which he suffers. Taylor Ltr. 6-7. It is of course wholly appropriate for the Court to take these into account, but his lymphoma has been in remission, *id.* at 7, and all can be treated in prison. Indeed, the defendant has not once raised that he has received inadequate medical care during his more than eight months of pre-sentencing incarceration. As the Court is aware, the Federal Bureau of Prisons is capable of handling such conditions, including, if need be, in a Federal Medical Center (although Taylor's conditions appear both stable and manageable).

Taylor asserts that the Guidelines overstate his culpability, because he argues that they double-count for loss and apply multiple similar enhancements. Taylor Ltr. 7-8. Whatever the merit from deviating from loss-based calculations in fraud cases, the aggregation here of the fraud loss and the tax loss is not impermissible even if the Court were to consider it double-counting. *See United States v. Campbell*, 967 F.2d 20, 25 (2d Cir.1992) ("[D]ouble counting is legitimate where a single act is relevant to two dimensions of the Guidelines analysis."). The losses for wire fraud and tax evasion are two different harms, and the approach Taylor suggests would mean that he should receive no additional punishment for the tax evasion offenses. Similarly, the enhancements for abuse of trust, charity, and numerous victims, each reflect unique and aggravating characteristics of Taylor's offenses. Moreover, to the extent these arguments support a variance, they are already factored into the Government's recommendation of a substantial downward variance from the correct Guidelines.

Taylor also argues that he is "unlikely to reoffend" because "[h]e will not run a charity, control its accounts, or hold a position of financial trust." Taylor Ltr. 8. This case is far different than *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (relied on by Taylor, *see* Taylor Ltr. 8), where the court found in the defendant's individual circumstances, that he we would not be in position to commit the offenses of conviction again because the defendant was "unlikely that he will ever be able to serve as an interpreter in an individual capacity" again. However, there is no legal bar that would prevent Taylor from running a charity, controlling its bank account or holding a position of financial trust upon release; indeed, the fact that his charity was not registered in New York or permitted to raise funds in New York did not deter Taylor from engaging in the criminal conduct in the first instance. Moreover, even if Taylor were unlikely to operate a charity again, Taylor's failure to accept responsibility for his crimes highlights a real concern that he could very likely find himself again in a situation of defrauding others in order to obtain funds to return to a life of luxury.

Taylor finally argues the financial impact of his sentence should mitigate his term of imprisonment. Taylor Ltr. 9. However, forfeiture, restitution, and imprisonment each serve a different sentencing purpose here. And while it is appropriate for the Court to consider the impact of the financial penalties here, it is also relevant that Taylor, despite his substantial education and talents, has not apparently sought or obtained employment since he was charged in this case almost two years ago, nor has he made any apparent efforts to repay the money he stole from donors and the charity. As a result, the financial aspects of Taylor's sentence do not warrant the leniency he seeks.

**E. The Court Should Order Restitution and Forfeiture**

The Mandatory Victims Restitution Act of 1996 ("MVRA") requires mandatory restitution in criminal cases where the offense is "an offense against property . . . , including any offense committed by fraud or deceit," 18 U.S.C. § 3663A(c)(1)(A)(ii), and where "an identifiable victim . . . has suffered a . . . pecuniary loss." *Id.* § 3663A(c)(1)(B). Under the MVRA, restitution must be ordered "to each victim in the full amount of each victim's losses . . . ." 18 U.S.C. § 3664(f)(1)(A); *United States v. Ojeikere*, 545 F.3d 220, 222 (2d Cir. 2008).

As reflected in Taylor's PSR and the victim impact statements, Taylor inflicted substantial damages to Modest Needs, its donors, and the individuals whose identities he used to further the fraud. The Probation Office appropriately calculated restitution in the amount of $2,739,752 to Modest Needs and its donors for this conduct. The Government is in the process of preparing a schedule of donors that have made claims. Taylor separately owes the IRS $1,404,893 as a result of taxes due and owning resulting from personal income tax evasion. In addition, as reflected in the PSR, as a result of committing wire fraud, Taylor personally benefited from the theft from Modest Needs, which amounts are subject to forfeiture. The defendant has already agreed to pay forfeiture in the amount of $3,118,237. *See* Dkt. 74.

**CONCLUSION**

For the reasons set forth above, the Government respectfully submits that a sentence of incarceration of 108 months is appropriate and would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

by: *s/ Eli J. Mark/ Rebecca R. Delfiner*
Eli J. Mark
Rebecca R. Delfiner
James Mandilk
Assistant United States Attorneys
(212) 637-2431